UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
LINDA SANDERS-PEAY,

                      Plaintiff,

            - against -

NEW YORK CITY DEPARTMENT OF
EDUCATION and LESLIE FRAZIER,
*individually and in her official capacity*,

                    Defendants.
------------------------------------------------------------x

**MEMORANDUM & ORDER**
20-CV-1115 (PKC) (VMS)

PAMELA K. CHEN, United States District Judge:

       Plaintiff Linda Sanders-Peay ("Plaintiff") brings this action against her former employer, the New York City Department of Education ("DOE"), and the principal of the school where she worked, Leslie Frazier ("Frazier") (collectively "Defendants"), alleging race, color, ethnicity, national origin, age, and disability discrimination and retaliation, in violation of Title VII, the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, the Age Discrimination in Employment Act ("ADEA"), 42 U.S.C. §§ 1981 and 1983 ("§ 1981" and "§ 1983," respectively), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").  Before the Court is Defendants' motion for summary judgment.  For the reasons discussed below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

I.    **Factual Background**[1]

A.    **Plaintiff's Employment History with DOE**

Plaintiff, a dark-skinned Black woman, began working for DOE as a parent coordinator at P.S. 21 in 2003.  (Pl.'s Am. R. 56.1 Statement, Dkt. 157 ("Pl.'s R. 56.1") ¶¶ 6, 11; Pl. Dep., Dkt. 108-3 ("Pl. Dep.") at 110:23–24.)  As a parent coordinator, Plaintiff's responsibilities included "creating a welcoming school environment for parents, [and] increasing parent involvement in the school," among other things.  (Pl.'s R. 56.1 ¶ 12.)  Like Plaintiff, Defendant Frazier is a Black woman who has worked at P.S. 21 since the early 2000s.  (*Id.* ¶ 7; Frazier Dep., Dkt. 108-4 ("Frazier Dep.") at 16:7–8, 28:12–25.)

B.    **The March 2017 Attack and Plaintiff's Subsequent Leave**

In March 2017, a parent attacked Plaintiff while she was at work.  (Pl. Dep. at 82:12–86:20.)  As a result of the attack, Plaintiff was taken to the hospital and was given a neck brace for neck, shoulder, and back injuries.  (*Id.* at 86:18–22, 89:1–4.)  The following day, Plaintiff notified Frazier that she could not return to work for the time being.  (*Id.* at 86:22–87:5.)  Shortly thereafter, Plaintiff applied for Workers' Compensation and began receiving physical therapy for her injuries as well as behavioral therapy for hypervigilance, depression, and post-traumatic stress disorder

---

[1] Unless otherwise noted, a standalone citation to a party's Local Rule 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citation to a 56.1 statement incorporates by reference the documents cited therein; where relevant, however, the Court may cite directly to an underlying document.  The Court construes any disputed facts in the light most favorable to Plaintiff, as the non-moving party, for purposes of Defendants' summary judgment motion. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  However, where Plaintiff either (i) admits or (ii) denies without citing to admissible evidence certain of the facts alleged in Defendants' Local Rule 56.1 statement, the Court may deem any such facts undisputed.  *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)–(d).

("PTSD") that resulted from the attack.  (*Id.* at 87:23–91:6, 94:1–10; *see also* Pl.'s Am. Decl., Dkt. 159 ("Pl. Decl.") ¶¶ 12–17.)

On September 13, 2018, Plaintiff's chiropractor wrote a letter clearing her to return to work.  (9/13/2018 Ltr. from Mollins, Dkt. 108-6.)  In his letter, he warned that Plaintiff should "not do any heavy lifting, pushing or pulling or any prolonged sitting, standing or walking."  (*Id.*) He also noted that Plaintiff was continuing treatment two to three times per week.  (*Id.*)

### C.     Plaintiff's Return to Work

Plaintiff returned to work on September 14, 2018.  (Pl. Dep. at 97:3–4.)  Shortly before her return, she ran into Defendant Frazier outside of the school.  (*Id.* at 96:10–25.)  There, Frazier explained to Plaintiff that "the school was getting a pre-K program" and that "the community was changing and heading in a different direction."  (*Id.*)  As a result, Frazier said that she was "looking for somebody a little more young and vibrant to be able to move at a faster pace with" the younger children who would now be at the school.  (*Id.* at 96:15–18.)  On Plaintiff's first day back at work, she stopped by the principal's office.  (*Id.* at 98:4–8.)  At that time, Frazier again told Plaintiff that "the community is heading in a different direction.  And the main intention with pre-K, we need somebody young, bilingual that can, you know, do the job."  (*Id.* at 98:4–11.)  At the time, Plaintiff was about 50 years old.  (*Id.* at 98:17.)

Also on that day, Plaintiff learned that another parent coordinator by the name of Ana Felix had been hired at P.S. 21.  (*Id.* at 97:17.)  Felix is a Hispanic woman.  (*Id.* at 125:25–126:2.)  A DOE Human Resources employee told Plaintiff that Felix would assist her in parent coordination. (*Id.* at 97:22–24.)  Ultimately, Frazier divided the parent coordination workload between Plaintiff and Felix by grade-level.  (*Id.* at 125:3–8.)  Felix was responsible for 3K, pre-K, and kindergarten, whereas Plaintiff was responsible for grades one through five.  (*Id.*; *see also* Frazier Dep. at 232:4–25.)  Plaintiff believed she had more work than Felix and that this split of the workload constituted

3

a demotion.[2]  (Pl. Dep. at 125:3–8, 131:6–8.)  A few days after Plaintiff returned to work, she sought to take bereavement leave for her brother's funeral, which had been previously planned. (*Id.* at 100:17–101:8.)  Frazier did not approve the leave, and Plaintiff was not paid for the time off.  (*Id.* at 154:11–20.)

Later that month, on September 27, 2018, there was a school fire drill.  (*Id.* at 127:10–14; Office of Equal Opportunity Compl., Dkt. 159-18 at ECF[3] 2.)  After the drill, Frazier accused Plaintiff of not participating as required.  (Pl. Dep. at 127:10–14.)  Plaintiff responded that she had participated and identified several people who could vouch for her.  (*Id.*)  According to Plaintiff, Frazier's voice escalated in response, and Frazier said, "I'm going to get rid of you, with your broken-down self."  (*Id.* at 127:21–128:1; *see also* Office of Equal Opportunity Compl., Dkt. 159-18 at ECF 2.)

### D.     Plaintiff's Complaints

Plaintiff notified her union representative about Frazier's comment at the fire drill.  (Pl. Dep. at 128:8–25.)  A few weeks later, Plaintiff filed a complaint about this incident with DOE's Office of Equal Opportunity ("OEO"), alleging race, ethnicity, disability, and age discrimination. (*See* OEO Compl., Dkt. 159-18.)  She also filed a complaint with the Equal Employment

---

[2] In addition, covering grades two, three, four, and five required Plaintiff to climb the stairs to the second and third floors of the building (where those grades were located), which was difficult for Plaintiff because of her injuries.  (Pl. Dep. at 125:3–15.)  This is ultimately irrelevant because Plaintiff did not tell Frazier—or any other DOE official—that she had difficulty climbing the stairs, (Pl.'s R. 56.1 ¶ 54), nor did her note from her chiropractor indicate that she could not or should not climb stairs, (9/13/2018 Ltr. from Mollins, Dkt. 108-6).

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

Opportunity Commission ("EEOC") alleging race, disability, and age discrimination.  (EEOC Pre-Charge Form, Dkt. 159-19 at ECF 2.)[4]

In addition to the fire drill incident, Plaintiff's OEO complaint raised several other issues, including that the school secretary, Maritza DeLeon ("DeLeon"), was generally mistreating her. (*See* OEO Compl., Dkt. 159-18.)  Plaintiff then filed another complaint with DOE's Special Commissioner of Investigation alleging that DeLeon was discriminating against her based on her race.  (OEO Rep., Dkt. 108-9 at 1, 3.)  The Special Commissioner of Investigation referred the Complaint to OEO, which investigated both complaints.  (*See id.*)  As a part of the investigation, OEO interviewed Plaintiff.  (*Id.*)  In that interview, Plaintiff explained that the discrimination included DeLeon saying "hola negra" to her, which Plaintiff construed as equivalent to DeLeon using the n-word.  (*Id.* at 2.)  Plaintiff also stated that Frazier and DeLeon did not sign off on her timecards, or on paperwork she had submitted seeking leave.  (*Id.* at 3.)  Plaintiff also complained that DeLeon and other Spanish-speaking staff spoke Spanish to each other in front of her, which Plaintiff believed was inappropriate.  (Pl. Dep. at 134:11–135:2.)  Ultimately, OEO found Plaintiff's claims of race discrimination against DeLeon and age and disability discrimination against Frazier to be unsubstantiated.  (OEO Rep., Dkt. 108-9 at 5.)

In addition to Plaintiff's above-referenced complaints, Plaintiff had a number of administrative issues that prevented her from being able to perform key job functions when she returned to work in September 2018.[5]  She was assigned an office with a computer, but the computer did not work properly.  (Pl. Decl. ¶ 40.)  Instead, she had to bring a personal computer

---

[4] Sometime later, the EEOC issued Plaintiff a right-to-sue letter in response to this complaint.  (Pl. Dep. at 130:13–15.)

[5] Plaintiff included these concerns in her initial OEO complaint.  (*See* OEO Compl., Dkt. 159-18.)

or use the computer lab, which staff typically did not use. (*Id.*) Plaintiff also did not have a phone line, (Pl. Dep. at 123:22), or a mailbox, (*id.* at 123:23). Unlike other employees, she did not have electronic timecard access. (*Id.* at 123:23–24, 132:6–9.) She did not have access to school wifi, and she was unable to use the school's printers. (*Id.* at 123:21–124:6.) Plaintiff's direct deposit stopped working twice. (*Id.* at 152:20–24.) Plaintiff informed Defendant Frazier of these issues via email. (*Id.* at 100:10–11.) Later, Plaintiff also complained that she did not get a parking permit. (*Id.* at 123:24, 177:12–178:19.)[6]

### E.    Plaintiff's Sought-After Accommodations and Leave

After Plaintiff returned to work, she needed to attend two to three weekly recurring physical and behavioral therapy appointments. (Pl. Dep. at 81:7–12, 122:10–13.) She requested an accommodation to attend the sessions. (Pl. Decl. ¶ 30.) Because "[t]here was never a scheduled time" for her appointments, (Pl. Dep. at 81:7–12), Plaintiff needed varying amounts of time off work during the middle of the day to attend her appointments, (*see id.*) Taking issue with the variability of the appointments, Frazier "denied [Plaintiff] the ability to attend therapy sessions." (Pl. Decl. ¶ 60.)

In early October 2018, Plaintiff met with Frazier, her union representative, and other DOE employees to discuss her requested accommodation as well as issues with Plaintiff's time and attendance. (Pl.'s R. 56.1 ¶ 103.) At the meeting, Frazier granted a request Plaintiff had made to modify her work schedule and instructed Plaintiff that if she was running late or not coming in, she had to either call and tell that directly to DeLeon, or email DeLeon. (10/15/2018 Ltr. from Frazier, Dkt. 108-13 at 1; 10/18/2018 Email from Pl., Dkt. 108-16.) Frazier also told Plaintiff that

---

[6] Plaintiff lives on the same block as P.S. 21 and was able to walk to and from work. (Pl. Dep. at 57:20–22.)

DOE needed documentation from Plaintiff's therapists indicating the time when her weekly therapy appointments would take place. (*See* Pl. Dep. at 109:6–15.) On October 15, 2018, Frazier sent a letter to Plaintiff[7] indicating that "[g]enerally[, DOE] employees are permitted one hour for therapy" and that, since Plaintiff needed more time than that, Plaintiff might need to take intermittent leave under the Family and Medical Leave Act ("FMLA"). (10/15/2018 Ltr. from Frazier, Dkt. 108-13 at 1.) The letter indicated that Plaintiff agreed to "obtain the documents necessary for submission and approval." (*Id.*) The letter also noted that between September 14, 2018 (when Plaintiff returned to work) and October 5, 2018, Plaintiff was "absent 9 out of 15 days and late 6 out of 6 days . . . that [she] was present." (*Id.*)

Plaintiff submitted additional letters to Frazier from her chiropractor dated October 24, 2018 and November 20, 2018. (*See* 10/24/18 & 11/20/18 Ltrs. from Mollins, Dkt. 108-14 at ECF 1–2.) Again, the letters did not indicate the specific time when Plaintiff would be seen weekly by the chiropractor, but stated that Plaintiff needed to receive treatment at least three times per week.[8] (*See id.*) On October 26, 2018, the Human Resources Director informed Frazier that for the purposes of intermittent FMLA, absences "over a period of more than 2 weeks" had to be regularly scheduled. (10/26/2018 Email from Pereyra, Dkt. 108-15.) That is, DOE was not going to permit ongoing unscheduled or "ad hoc" absences. (*Id.*)

Beginning around late November 2018, Plaintiff began calling out of work every day, informing either DeLeon or another DOE employee of her daily absences over the phone.[9] (Pl.

---

[7] The letter was also placed in Plaintiff's personnel file. (Pl.'s R. 56.1 ¶ 145.)

[8] Plaintiff seemingly did not submit a note from her psychiatrist about her behavioral therapy appointments until mid-December. (Pl. Decl. ¶ 63.)

[9] At times, Plaintiff had her family members call P.S. 21 to report that she would be taking a sick day. (Pl. Dep. at 148:1–8.)

Dep. at 147:23–149:12, 150:4–17.)   In November 2018, Plaintiff applied for leave under the FMLA.  (*Id.* at 147:1–23; 3/7/2019 Ltr. from Frazier, Dkt. 108-22 at ECF 2.)  This request was later withdrawn, and then was resubmitted as a request for Worker's Compensation Leave. (3/7/2019 Ltr. from Frazier, Dkt. 108-22 at ECF 2; *see also* Pl. Decl. ¶¶ 75–77 (referring to this leave request as a "Restoration of Health" leave request).)  The stated basis for the leave request was the need for Plaintiff to attend her appointments so that she could continue to recover from ongoing mental and/or physical health issues.  (*See* Pl. Dep. at 122:18–23.)  Plaintiff's request for leave was ultimately approved, though she did not learn of the approval until April 2019. (*Compare* 3/7/2019 Ltr. from Frazier, Dkt. 108-22 at ECF 2 (Frazier noting that as of March 7, 2019, Plaintiff's Worker's Compensation Leave request was still pending), *with* Pl. Decl. ¶ 77 (stating that Plaintiff's leave request was approved on January 2, 2019, but that she was not advised of the approval until April 11, 2019).)  Plaintiff's attendance record indicates that during this time period, she had many "unexpected absences" and "unpaid day[s] off."  (*See* Attendance Rep., Dkt. 108-17 (demonstrating 54 "unexpected absence[s]" and 12 "unpaid day[s] off" between September 14, 2018, and February 26, 2019); *see also* 3/7/2019 Ltr. from Frazier, Dkt. 108-22 at ECF 1–2 (noting that Plaintiff failed to appear for two scheduled disciplinary conferences about her attendance and concluding that Plaintiff "failed to follow" DOE's attendance policies).)

During this time, Plaintiff was paid.  (Frazier Dep. at 152:14–21.)  However, she had multiple issues with direct deposit.  (Pl. Dep. at 152:22–24.)  First, right after she returned to work in September 2018, her direct deposit stopped.  (*Id.*)  That was rectified, but then in December of that year, her direct deposit was stopped again.  (*Id.*; *see also* Frazier Dep. at 151:15–152:13.)  In the second instance, Frazier testified that DOE's head of Human Resources paused Plaintiff's direct deposit and instead started paying her with paper checks to encourage her to communicate

with DOE about her employment status, which Frazier believed was unclear at the time.  (Frazier Dep. at 151:15–152:13.)[10]

### F.    Plaintiff's Application for Students in Temporary Housing Coordinator

In December 2018, Plaintiff applied for a position as a Students in Temporary Housing Coordinator with DOE.  (Pl. Dep. at 114:5–115:1.)  Frazier was in charge of hiring for the position. (*See* Frazier Dep. at 384:19–25.)  Frazier did not hire Plaintiff for the position.  (Pl. Dep. at 115:1.) Instead, Frazier hired Lillian Robinson, who is also a Black woman.  (*Id.* at 114:13–20, 118:10– 12.)

### G.    Plaintiff's Final Months of Employment

On February 25, 2019, Plaintiff attended a staff meeting at P.S. 21.  (Pl. Decl. ¶ 79.) Plaintiff states that during the meeting, she was distraught and told her colleagues that she was not being paid and that Frazier and DOE's head of Human Resources were not listening to her.  (*Id.* ¶¶ 79–80.)  Teachers escorted her out of the meeting.  (*Id.* ¶ 80.)  On March 14, 18, and 20, 2019, DOE attempted to hand deliver a summons letter for a disciplinary conference relating to this incident.  (3/26/2019 Ltr. from Arnold, Dkt. 108-23.)  Each time, Plaintiff refused to accept the letter.  (*Id.*)  A disciplinary conference was ultimately held on March 25, 2019; Plaintiff did not attend.  (*Id.*)  On March 26, 2019, after obtaining six witness statements, a P.S. 21 assistant principal issued a disciplinary letter to Plaintiff's file finding that Plaintiff had "engaged in professional misconduct and insubordination" at the staff meeting, including by publicly calling Frazier a "liar" and "the devil."  (*Id.*)

---

[10] Frazier herself does not have the authority to stop any employee's direct deposit.  (Pl. Dep. at 155:17–18.)

On February 27, 2019, Plaintiff made a complaint to the DOE Chancellor against Frazier for allowing a P.S. 21 teacher to sell candy to students for a non-school-related fundraiser. (Compl. to DOE Chancellor, Dkt. 159-44 at ECF 2.) On March 7, 2019, P.S. 21's Parent-Teacher Association ("PTA") Executive Board sent a letter to Frazier and other DOE officials indicating that they had "grave concerns" about Plaintiff, including that she was behaving in an "erratic & unprofessional" manner, that she was inaccessible to parents, and that she had "tagged" the P.S. 21 PTA's Facebook account in a "defaming" Facebook post about the P.S. 21 teacher who allegedly had sold candy to students. (3/7/2019 Ltr. from PTA Exec. Bd., Dkt. 159-45 at ECF 2.)[11] On the same day, Frazier sent a disciplinary letter to Plaintiff, concluding that Plaintiff had "failed to follow" DOE's attendance policies. (3/7/2019 Ltr. from Frazier, Dkt. 108-22 at ECF 1–2.)

On May 1, 2019, Frazier issued multiple additional disciplinary letters to Plaintiff's file relating to Plaintiff's use of certain "unauthorized exits" and Plaintiff "inappropriately taking a video of DeLeon and the timecard area of the school office on March 5, 2019." (Pl.'s R. 56.1 ¶¶ 165–68; see also 5/1/2019 Ltr. from Frazier re: Unauthorized Exits, Dkt. 108-30; 5/1/2019 Ltr. from Frazier re: Video, Dkt. 108-31.) Around the same time, Frazier issued a termination letter to Plaintiff, terminating her because of the Facebook post detailed in the PTA Executive Board letter. (Pl.'s R. 56.1 ¶ 169; 3/26/2019 Ltr. from Frazier re: Termination, Dkt. 108-34.)[12]

---

[11] Plaintiff disputes the veracity of this letter, alleging in her Amended Declaration that Frazier "orchestrated" the letter's issuance. (Pl. Decl. ¶¶ 83–84.) However, Plaintiff does not cite any evidence in the record that supports this proposition. (See id.) As such, the Court deems the veracity of the letter to be undisputed. See Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)–(d).

[12] The termination letter is dated March 26, 2019, but refers to events that took place after that date. (See 3/26/2019 Ltr. from Frazier re: Termination, Dkt. 108-34.) The Court assumes that

## II.    Procedural History

Plaintiff initially filed this action *pro se* against P.S. 21, DOE, and Parent Teacher Association District 16K021 on February 26, 2020.  (Compl., Dkt. 1.)  In November 2020, counsel appeared on Plaintiff's behalf.  (Notice of Appearance, Dkt. 9.)  On February 8, 2021, Plaintiff filed her Amended Complaint, removing P.S. 21 and the Parent Teacher Association as defendants, and adding Frazier.  (Am. Compl., Dkt. 22 ("Am. Compl.").)  Defendants answered the Amended Complaint on June 30, 2021.  (Answer, Dkt. 33.)  The parties then conducted discovery over a period of years, with Magistrate Judge Vera M. Scanlon resolving numerous discovery disputes between them.  (*See, e.g.*, 10/12/2021 Dkt. Order (addressing discovery disputes); 12/16/2021 Dkt. Order (same); 1/14/2022 Dkt. Order (same); 3/23/2022 Dkt. Orders (same); 6/29/2022 Dkt. Order (same); Mem. & Order re: Mot. to Compel, Dkt. 88 (same); 11/16/2022 Dkt. Order (denying reconsideration of Memorandum and Order resolving a discovery dispute); 1/27/2023 Dkt. Order (addressing discovery dispute).)

After this extensive discovery, the Court set a briefing schedule for summary judgment.  (3/8/2023 Dkt. Order.)  During the briefing process, the Court granted many extension requests, including six from Plaintiff.  (*See* 4/12/2023 Dkt. Order (granting Defendants' consent motion for extension); 6/6/2023 Dkt. Order (granting Plaintiff's consent motion for extension); 6/27/2023 Dkt. Order (same); 7/17/2023 Dkt. Order (same); 7/28/2023 Dkt. Order (same); 8/2/2023 Dkt. Order (noting that Plaintiff missed the deadline to file a letter indicating that she had served her response to Defendants' motion for summary judgment and *sua sponte* extending the deadline); 8/3/2023 Dkt. Order (granting Plaintiff's consent motion for extension).)

---

the date on the letter is a typographical error and that the termination took place on or around May 1, 2019, as indicated in the Rule 56.1 Statement.  (Pl.'s R. 56.1 ¶ 169.)

Three days after Defendants served their summary judgment reply, Plaintiff's counsel filed a letter indicating that she had mistakenly served "drafts" of her summary judgment response (and accompanying documents) on Defendants, instead of the final documents. (Pl.'s Ltr., Dkt. 113 at 1–2.) As Plaintiff describes in her letter to the Court, several of these drafts were "without citations to the record and were without the attached exhibits." (*Id.* at 2.) Plaintiff requested leave from the Court to file amended versions of her opposition documents. (*Id.*) Defendants' counsel did not consent to Plaintiff filing amended versions of the documents and moved for sanctions against Plaintiff. (*Id.*; *see also* Mot. for Sanctions, Dkt. 152.) Ultimately, the Court ruled that it would consider Plaintiff's amended filings, given the judiciary's "strong preference for resolving disputes on the merits," but permitted Defendants to file an amended reply, which Defendants did on March 1, 2024. (10/16/2023 Dkt. Order (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011)); Defs.' Am. Reply, Dkt. 171.) The Court denied Defendants' motion for sanctions. (10/16/2023 Dkt. Order.)

Nearly two months after the parties filed their amended summary judgment briefing, Plaintiff requested to file a sur-reply regarding the admissibility of certain declarations she had filed. (Pl.'s Mot. to File Sur-Reply, Dkt. 172.) The Court permitted the filing. (4/25/2024 Dkt. Order.) In response, Defendants filed a sur-sur-reply. (Defs.' Sur-Sur-Reply, Dkt. 174.) Defendants' motion for summary judgment is now ripe for decision.[13]

---

[13] The Court notes that because Plaintiff's Amended Complaint uses conclusory, boilerplate language to plead many theories of liability without reference to specific supporting allegations, (*see, e.g.*, Am. Compl. ¶¶ 232–35 (repeatedly referring to Defendants' "actions" and "inactions," instead of particular facts of the case); *see also id.* ¶¶ 130–212 (pleading failure to hire, disparate treatment, hostile work environment, and retaliation theories of liability under Title VII, the ADA, the Rehabilitation Act, the ADEA, § 1981, the NYSHRL, and the NYCHRL), it is "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Croons v. N.Y. State Off. of Mental Health*, 18 F. Supp. 3d 193, 199 (N.D.N.Y. 2014)

**LEGAL STANDARD**

To obtain summary judgment, the moving party must establish that "there is no genuine dispute as to any material fact," and that the moving party is therefore "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). "Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

"The moving party bears the burden of showing that [they are] entitled to summary judgment." *Ramirez v. Rifkin*, 568 F. Supp. 2d 262, 267 (E.D.N.Y. 2008). Where the defendant is the moving party, there is "no express or implied requirement" that the defendant "negat[e] [the plaintiff's claim" with evidence of its own, as long as it "point[s] out to the district court . . . that there is an absence of evidence to support [the plaintiff's] case." *Celotex Corp.*, 477 U.S. at 323, 325 (emphasis omitted). Once a defendant has met this burden, the plaintiff must "do[] more than simply rely on the contrary allegation[s] in [his] complaint," rather, they must "go beyond the pleadings" to "designate specific facts showing that there is a genuine issue for trial." *Adickes*, 398 U.S. at 160; *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted); *see also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (explaining that a non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some

---

(quoting *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)) (internal quotation marks omitted). Nonetheless, the Court has read Plaintiff's claims expansively and undertaken the byzantine task of sifting through the veritable mountain of evidence and briefing produced by the parties in deciding Defendants' summary judgment motion.

hard evidence" to defeat summary judgment) (collecting cases).  That is, "a plaintiff opposing summary judgment may not rely on his complaint to defeat the motion[.]"  *Champion v. Artuz*, 76 F.3d 483, 485 (2d Cir. 1996) (per curiam).  Instead, the party opposing summary judgment must "come forward with specific facts showing that there is a genuine issue for trial."  *Ramirez*, 568 F. Supp. 2d at 267 (emphasis omitted) (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002)).

## DISCUSSION

### I.   Materials Considered

The parties dispute whether the Court can properly consider several declarations Plaintiff filed with her opposition papers.  (Pl.'s Sur-Reply, Dkt. 173; Def.'s Sur-Sur Reply, Dkt. 174; *see also* Defs.' Am. Reply, Dkt. 171 ("Defs.' Reply") at 1–2.)  Defendants argue that the Court must disregard the declarations[14] of certain individuals because Plaintiff did not disclose these individuals as potential witnesses in her Rule 26 Disclosures.  (Defs.' Reply at 1 (citing Pl.'s R. 26 Disclosures, Dkt. 110-1 at 1).)  Plaintiff responds that she did list at least one of the individuals in question on her initial disclosures as a "[m]ember[] of the Executive Board of the PTA, as yet unidentified[.]"  (Pl.'s R. 26 Disclosures, Dkt. 110-1 at 1; Pl.'s Sur-Reply, Dkt. 173 at 2–3.)  Plaintiff also argues that Defendants "were well aware that at least three of the declarants were likely to have discoverable information" because these individuals were mentioned at various points during the discovery process.  (Pl.'s Sur-Reply, Dkt. 173 at 2–3.)  Consequently, Plaintiff asserts that Defendants would not be prejudiced if Plaintiff relies on those individuals' declarations.  (*Id.*)  For the remaining declarants, Plaintiff conclusorily argues—without legal

---

[14] The declarations in question are those of Anthony Revell, Trina Myers, Annette Hosack, Wilfredo Serrano, Koren Robinson, and Modupe Scott.  (*See* Dkts. 160–65.)

citation—that her failure to include these declarations in her Rule 26(a) initial disclosures "was a technical violation only." (*Id.* at 4.)

"[T]o satisfy Rule 26, parties must make an unequivocal statement that they may rely upon an individual on a motion or at trial." *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 73 (E.D.N.Y. 2012) (citing *Kullman v. New York*, No. 07-CV-716 (GLS) (DRH), 2009 WL 1562840, at *6–8 (N.D.N.Y. May 20, 2009)) (collecting cases).  Merely mentioning an individual during discovery is not enough to meet the Rule 26 standard; instead a party must make a "['']declaration' that they might call the individual as a trial witness, 'either in a letter, electronic mail, on-the-record during another deposition or court proceeding, or the like.'" *Id.* (quoting *Kullman*, 2009 WL 1562840, at *6).  By her own admission, Plaintiff did not do so here as to any of the 6 witnesses whose declarations she now seeks to rely upon.[15]  (Pl.'s Sur-Reply, Dkt. 173 at 2–3.)  Thus, the declarations are inadmissible, and the Court does not consider them in ruling on Defendants' motion for summary judgment.[16]

---

[15] The only arguable exception is declarant Trina Myers, who was a member of the PTA Executive Committee.  As previously explained, in Plaintiff's initial disclosures, she listed generally "[m]embers of the Executive Board of the PTA, as yet unidentified" as possible witnesses.  (Pl.'s R. 26 Disclosures, Dkt. 110-1 at 1.)  Rule 26, however, requires that parties provide "the name" of individuals they may rely on as witnesses.  Fed. R. Civ. P. 26(a)(1)(A)(i).  And though Plaintiff might not have known Myers' name at the outset of discovery, she certainly did at some point before she submitted Myers' declaration.  Yet Plaintiff did not supplement her initial disclosures to identify Myers as a potential witness.  Consequently, Plaintiff's mere listing of "[m]embers of the Executive Board of the PTA" in her initial disclosures is insufficient to comply with Rule 26's requirements.  (Pl.'s R. 26 Disclosures, Dkt. 110-1 at 1); Fed. R. Civ. P. 26(a)(1)(A)(i).

[16] In any event, the Court has reviewed the declarations in full, and even if the Court did consider them, they would not change the outcome of the instant motion.

## II.     Plaintiff's NYSHRL and NYCHRL Claims Against DOE are Procedurally Barred

Plaintiff asserts a number of claims against both Defendants under the NYSHRL and the NYCHRL.   (*See* Am. Compl. ¶¶ 196–230.)   They are all procedurally barred and must be dismissed.

"Under New York law, a plaintiff seeking to bring a claim against a school district or its officers that involves the rights or interests of the school district must file a written notice of claim on the governing board of the district within 90 days of the accrual of the claim." *Williams v. Geiger*, 447 F. Supp. 3d 68, 87 (S.D.N.Y. 2020) (citing N.Y. Educ. Law § 3813(1)).   A plaintiff asserting such claims against a school district "must plead and prove that she has filed a timely notice of claim, or risk dismissal of the claim." *Id.*   This applies to claims brought against school districts under both the NYSHRL and the NYCHRL.  *See id.* at 87–88 (dismissing NYSHRL and NYCHRL claims against DOE because the plaintiff did not file a timely notice of claims).

Plaintiff did not file a timely notice of claim in the instant case.   (*See generally* Am. Compl., Dkt. 22.)   After the time period to file a notice of claim expired, she sought leave from the New York State courts to file a late notice of claim.   (Order Denying Request to File Late Notice of Claim, Dkt. 108-43.)   That request was denied.   (*Id.*)   Consequently, her NYSHRL and NYCHRL claims against DOE are not procedurally proper.   The Court therefore grants summary judgment on these claims.

## III.    Plaintiff's Abandoned Claims

Parties may abandon claims throughout the course of litigation.  *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016).   At summary judgment, "a court may, when appropriate, infer from a party's partial opposition that relevant claims . . . that are not defended have been abandoned." *Id.* (quoting *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014)).   If a claim has been abandoned, a district court "should . . . include a finding of

abandonment of undefended claims[.]"  *Id.* (alteration in original) (quoting *Jackson*, 766 F.3d at 198).  As described below, the Court finds that Plaintiff has abandoned several of her claims.

### A.      Plaintiff's § 1983 Claim

Plaintiff pleaded a municipal liability claim under 42 U.S.C. § 1983.  (Am. Compl. ¶¶ 231–235.)  Defendants urge dismissal of this claim on the basis that Plaintiff has not developed evidence that would tend to support such a claim.  (Defs.' Mem. of Law Supp. Mot. for Summ. J., Dkt. 109 ("Defs.' Br.") at 3.)  Plaintiff does not respond to this argument.  (*See generally* Pl.'s Am. Mem. Opp'n Summ. J., Dkt. 156 ("Pl.'s Br.").)  Consequently, the Court finds this claim abandoned, and Defendants' motion for summary judgment is granted on this claim.

### B.      Plaintiff's Disability- and Age-Based Failure-to-Hire Claims

In her Amended Complaint, Plaintiff brings age and disability discrimination claims on a failure-to-hire theory under the ADEA, the ADA, the Rehabilitation Act, and the NYSHRL.[17]  (*See* Am. Compl. ¶¶ 147, 150, 160, 161, 187, 188.)  In her brief, she does not respond to Defendants' argument that her disability-based failure-to-hire claims should be dismissed.  (*Compare* Defs.' Br. at 14, *with generally* Pl.'s Br.)  Consequently, the Court finds those claims abandoned and grants summary judgment on those claims.

Summary judgment must also be granted on Plaintiff's age-based failure-to-hire claim because Plaintiff admitted that the failure to hire her as a Students in Temporary Housing Coordinator was not based on her age.  (Pl.'s R. 56.1 ¶¶ 132, 136; *see also* Pl. Dep. at 116:14–19 (Plaintiff testifying that the failure to hire her for the Students in Temporary Housing Coordinator position was not "based upon [her] age.").)  Moreover, in her brief, Plaintiff does not respond to

---

[17] Plaintiff also brought the same claims under the NYCHRL.  (Am. Compl. ¶¶ 210, 228.) Summary judgment is granted on those claims for the reasons described in Sections II and III.E, respectively.

Defendants' argument that her age-based failure-to-hire claims should be dismissed.  (*Compare* Defs.' Br. at 14 n.6, *with generally* Pl.'s Br.)  As a result, the Court deems these claims abandoned and also grants summary judgment on them.

### C.    Plaintiff's Age-Based Retaliation Claim

In her Amended Complaint, Plaintiff brings age-based discrimination claims, including retaliation claims, under the ADEA and the NYSHRL.[18]  (Am. Compl. ¶¶ 163, 191.)  In responding to Defendants' arguments that Plaintiff's age-based retaliation claims should be dismissed, Plaintiff does not suggest that the alleged retaliation against her was based on her age.  (*Compare* Defs.' Br. at 15–20, *with* Pl.'s Br. at 25–27.)  Accordingly, the Court deems these claims abandoned and grants Defendants' motion for summary judgment as to them.

### D.    Plaintiff's Race, Color, Ethnicity, and National Origin-Based Hostile Work Environment Claims

The same is true for Plaintiff's race, color, ethnicity, and national origin-based hostile work environment claims under Title VII, § 1981, and the NYSHRL.[19]  (*See* Am. Compl., Dkt. 22 ¶¶ 138, 175, 193.)  In her brief, Plaintiff fails to provide any evidence or argument in response to Defendants' argument that summary judgment should be granted on these claims.  (*Compare* Defs.' Br. at 20–23, *with generally* Pl.'s Br.)[20]  Consequently, the Court also finds these claims abandoned, and summary judgment is granted on them.

---

[18] Plaintiff also brought an age-based retaliation claim under the NYCHRL.  (Am. Compl. ¶¶ 202, 208, 226.)  Summary judgment is granted on that claim for the reasons described in Sections II and III.E., respectively.

[19] Plaintiff also brought race-based hostile work environment claims under the NYCHRL. (Am. Compl. ¶¶ 204, 205, 222, 223.)  Summary judgment is granted on that claim for the reasons described in Sections II and III.E., respectively.

[20] In the section of her brief addressing her hostile work environment claims, Plaintiff does reference "DeLeon calling her a racial slur"—presumably referring to DeLeon's alleged use of the

### E.    Plaintiff's NYCHRL Claims Against Frazier

Plaintiff has also abandoned her remaining NYCHRL claims against Frazier by failing to make any legal argument in support of them.  Plaintiff pleaded several different theories of liability under the NYCHRL.  (*See* Am. Compl. ¶¶ 213–30.)  However, in her brief discussion of the NYCHRL, Plaintiff does not so much as allude to the underlying facts of the case.  (*See* Pl.'s Br. at 37–38.)  Instead, she merely describes two cases in which defendants' motions for summary judgment on NYCHRL claims were denied.  "To make a legal argument is to advance one's contentions by connecting law to facts."  *Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002).  Plaintiff has not done so here.  (*See* Pl.'s Br. at 37–38.)  It is not the Court's role "to scour the record . . . and serve generally as an advocate" for Plaintiff.  *Sioson*, 303 F.3d at 460 (internal quotation marks omitted); *see also Lipton v. County of Orange*, 315 F. Supp. 2d 434, 439 n.3 (S.D.N.Y. 2004) (explaining that when a plaintiff fails to connect legal principles "to properly cited facts," it is not the court's "responsibility, . . . to form plaintiff's arguments for [them] by researching the record and relevant case law").  Thus, the Court deems Plaintiff's remaining NYCHRL claims abandoned and grants Defendants' motion for summary judgment on all of Plaintiff's NYCHRL claims.

---

word "negra."  (Pl.'s Br. at 30.)  It is unclear whether Plaintiff seeks to rest her race-based hostile work environment claims on that single incident, since she does not mention other relevant evidence.  Even if so, stray remarks by a coworker are insufficient evidence alone to prevail on a hostile work environment claim.  *Fukelman v. Delta Air Lines, Inc.*, No. 18-CV-2 (PKC) (PK), 2020 WL 4587496, at *23–24 (E.D.N.Y. Apr. 13, 2020), *R. & R. adopted*, 2020 WL 2781662 (E.D.N.Y. May 29, 2020).

## IV.    Plaintiff's Remaining Claims

### A.    Title VII, § 1981, and NYSHRL[21] Race, Color, Ethnicity, & National Origin Discrimination Claims

The same standards apply to Plaintiff's race, color, ethnicity, and national origin discrimination claims brought under Title VII, § 1981, and the NYSHRL.  *Rivera v. Rochester Genessee Regional Transp. Auth.*, 743 F.3d 11, 20 n.4, 24 n.8, 27 (2d Cir. 2014).  Each theory of liability that Plaintiff pleads is discussed in turn, and for the reasons explained, the Court grants summary judgment on all of these claims.

#### 1.    Disparate Treatment

The three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas* provides the framework for analyzing disparate treatment claims based on race, ethnicity, color, and/or national origin under Title VII, § 1981, and the NYSHRL.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (Title VII and § 1981); *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 323–24 (S.D.N.Y. 2020) (Title VII and the NYSHRL).  Under this framework, "[f]irst, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981)).  To make out a prima facie case of discrimination at this stage of the litigation, a plaintiff must raise a genuine question of material fact "by showing that: '(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'"

---

[21] Because the Court grants summary judgment on all of Plaintiff's NYSHRL claims against DOE for the reason described in Section II, *supra*, the only NYSHRL claims remaining at issue in Section IV are those brought against Frazier.

*Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).  Put another way, to preclude summary judgment on a disparate treatment claim for race, color, ethnicity, and/or national origin discrimination, a plaintiff must raise a genuine question of material fact as to whether their race, color, ethnicity, or national origin was a "'substantial' or 'motivating' factor contributing to the employer's decision to take the [adverse] action."  *Id.* at 85 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 249 (1989) (plurality opinion)).  After a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *See id.* at 83; *McDonnell Douglas*, 411 U.S. at 802.  The burden then shifts back to the plaintiff to present evidence that the employer's proffered reason is pretext for an impermissible motivation.  *See Vega*, 801 F.3d at 83; *McDonnell Douglas*, 411 U.S. at 804.  If the plaintiff cannot establish pretext, the employer is entitled to summary judgment.  *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

Here, Plaintiff is unable to raise the necessary inference of discrimination on the basis of race, ethnicity, color, or national origin.  She points to three pieces of evidence in support of her argument that she has raised a genuine issue of material fact on this question—none of which raises the requisite question of material fact.  First, Plaintiff argues that her co-worker, DeLeon, generally treated her poorly and once said "[h]ola negra" to her.  (*See* OEO Rep., Dkt. 108-9 at 1–2.)  Plaintiff believed the use of the word "negra" was akin to using the n-word or the word "blackie."  (*See id.*)  Second, Plaintiff argues that Frazier's comment that P.S. 21 needed someone bilingual demonstrates discriminatory animus.  (Pl. Dep. at 98:4–11.)  Third, Plaintiff testified to her own belief that Frazier and DOE had discriminated against her based on her race.  (*See id.* at 110:20–111:21.)

With respect to DeLeon's comment, that comment alone does not raise a genuine question of material fact as to whether Plaintiff experienced race, color, ethnicity, or national origin discrimination in violation of Title VII, § 1981, or the NYSHRL.  As an initial matter, it is unclear whether DeLeon's comment was discriminatory.  Other courts have noted that the word "negra" can be a pejorative or a term of endearment.  *See Rivera Sanchez v. Ranger Am. of P.R.*, No. 03-CV-2033 (SEC), 2008 WL 11502080, at *3 n.5 (D.P.R. June 30, 2008) (explaining that "there are different connotations for the terms 'negra' and 'negrita,' . . . [which] can be used as terms of endearment . . . or in a pejorative manner against black people"); *see also Serrano-Nova v. Banco Popular de P.R., Inc.*, 254 F. Supp. 2d 251, 256 n.1 (D.P.R. 2003) (similar).  Furthermore, even assuming *arguendo* that DeLeon's comment was discriminatory, a single stray discriminatory remark, on its own, "do[es] not support a discrimination suit."  *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998).

Second, Plaintiff argues that Frazier demonstrated discriminatory animus when she said that the school needed more bilingual staff.  (Pl. Dep. at 98:4–11.)  In general, "a preference, or even requirement, that employees have bilingual ability does not give rise to a discrimination claim based on national origin or race."  *Chhim v. Spring Branch Indep. Sch. Dist.*, Civ. Action No. H-09-3032, 2009 WL 5170214, at *3 (S.D. Tex. Dec. 18, 2009) (collecting cases), *aff'd*, 396 F. App'x 73 (5th Cir. 2010) (per curiam); *see also Cooper v. Conn. Pub. Def.'s Off.*, 480 F. Supp. 2d 536, 547 (D. Conn. 2007) (holding that consideration of a prospective employee's ability to speak Spanish was not *per se* discriminatory).  Of course, "[l]anguage requirements can be a proxy or 'covert basis' for race discrimination *if* there is evidence establishing discriminatory intent[.]" *Joyce v. Sewon C&A Inc.*, No. 21-CV-355 (WKW), 2022 WL 6766144, at *5 (M.D. Ala. Oct. 11, 2022).  Plaintiff, however, has not pointed to other evidence of relevant discrimination by Frazier

that would suggest that Defendants used language ability as a proxy for discrimination. Consequently, this comment does not raise a genuine question of material fact as to whether Plaintiff experienced race, color, ethnicity, or national origin discrimination.

Finally, Plaintiff's instinct or belief that Frazier and DOE were discriminating against her based on her race, color, ethnicity, or national origin—without more—cannot support a discrimination claim. *See Bobb v. Potter*, No. 04-CV-283 (FB) (LB), 2007 WL 1300975, at *3 (E.D.N.Y. May 3, 2007) (holding that plaintiff's "gut feeling" that his supervisor's "treatment of him was based on race [was] not sufficient to create an inference of discrimination"); *Shabat v. Blue Cross Blue Shield of Rochester Area*, 925 F. Supp. 977, 988 (W.D.N.Y. 1996) (holding that "an employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion" (quoting *Douglass v. United Servs. Auto. Ass'n*, 65 F.3d 452, 459 (5th Cir. 1995)) (internal quotation marks omitted)).   These statements are conclusory.   (*See, e.g.*, Pl. Dep. at 115:25–116:5 ("I was discriminated against based on a lot of . . . factors; my race, my color, my name.   Because they know who I am down at HR."); *see also id.* at 110:17–111:21 (similar).)   Nor does the Court find the combination of Plaintiff's belief and the other two facts she relies on—the "negra" greeting and the bilingual requirement—to be sufficient evidence of discriminatory animus.

Accordingly, because Plaintiff has failed to adduce sufficient evidence from which a jury could infer discrimination on the basis of race, color, ethnicity, or national origin, the Court grants summary judgment on her disparate treatment claims.

### 2.   Failure to Hire

Plaintiff asserts that Defendants' failure to hire her as the Students in Temporary Housing Coordinator resulted from "colorism."   (Pl.'s Br. at 34.).   However, she provides no evidence whatsoever that this failure to hire was related to her color, and so her claim fails.   (*See id.* at 34–

37 (discussing Plaintiff's failure to hire claim without mentioning any relevant evidence in the record).) Frazier, who oversaw the hiring process for this position, testified that she did not review all of the applications because they were numerous, and so it was never established that Frazier even knew that Plaintiff had applied for the position. (Frazier Dep. at 384:14–18.) In addition, the person that Frazier ultimately hired for the position was, like Plaintiff and Frazier, a Black woman.[22] (Pl. Dep. at 114:13–20, 118:10–12). Because Plaintiff provides no evidence whatsoever that the failure to hire her for the Students in Temporary Housing Coordinator position was based on her color, the Court grants summary judgment on these claims.

### 3.   Retaliation

Title VII prohibits employers from "discriminat[ing] against any of [their] employees" for engaging in protected activities, including making "a charge, testif[ying], assist[ing] or participat[ing] in any manner in an investigation[.]" 42 U.S.C. § 2000e-3(a). "Retaliation claims brought under the NYSHRL and § 1981 are subject to the same standards as federal claims under Title VII." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 275 (2d Cir. 2023). In evaluating retaliation claims, courts again rely on the *McDonnell Douglas* framework. *Zann Kwan v. Andalex Grp.*, 737 F.3d 834, 843 (2d Cir. 2013). "Under the first step of the *McDonnell Douglas* framework [for retaliation claims], the plaintiff must establish a prima facie case of retaliation by showing 1) 'participation in a protected activity'; 2) the defendant's knowledge of the protected activity; 3) 'an adverse employment action'; and 4) 'a causal connection between the protected activity and the adverse employment action.'" *Id.* at 844 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

---

[22] It is unclear from the record whether the individual Frazier hired was darker- or lighter-skinned than Plaintiff.

Defendant argues that Plaintiff did not engage in any protected activity.  As the Second Circuit has explained, a plaintiff's burden in establishing that she has participated in a protected activity is "*de minimis*."  *Id.* (quoting *Jute*, 420 F.3d at 173).  Indeed, "[t]o prevail on a retaliation claim, 'the plaintiff need not prove that her underlying complaint of discrimination had merit,' but only that it was motivated by a 'good faith, reasonable belief that the underlying employment practice was unlawful.'"  *Id.* at 843 (first quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012); then quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)).  "[F]iling a formal complaint" is a protected activity.  *Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014).

After Plaintiff returned to work in late 2018, she filed a pre-charge form with the EEOC and also filed two discrimination complaints with DOE.  (EEOC Pre-Charge Form, Dkt. 159-19 at ECF 2; OEO Compl., Dkt. 159-18 at ECF 2; OEO Rep., Dkt. 108-9 at 1.)  These complaints each allege race discrimination in some form or another.  (*See* EEOC Pre-Charge Form, Dkt. 159-19 at ECF 2, 7 (checking a box to indicate that Plaintiff had experienced race discrimination and indicating that Felix was treated better than her on account of, *inter alia*, her race); OEO Compl., Dkt. 159-18 at ECF 2 (indicating that Plaintiff believed DeLeon and Frazier discriminated against her based on race); OEO Rep., Dkt. 108-9 at 1 (noting that Plaintiff had filed an additional race discrimination complaint against DeLeon).)

Still, Defendants contend that Plaintiff's formal race discrimination complaints do not allege sufficient facts about the discrimination to constitute protected activities.  (Defs.' Br. at 16.) That argument is a non-starter: Plaintiff clearly indicated in her complaints that she believed she had experienced race discrimination, and, in at least one instance, provided details about alleged discrimination.  (*See* EEOC Pre-Charge Form, Dkt. 159-19 at ECF 2, 7.)  Moreover, Defendants

have not presented any evidence that Plaintiff did not have a "good faith, reasonable belief" that she had been subjected to an unlawful employment practice. *Andalex*, 737 F.3d at 843. Consequently, Plaintiff has met her *de minimis* burden of demonstrating that she engaged in a protected activity.

Defendants also contend that, at a minimum, Frazier could not have retaliated against Plaintiff based on her EEOC complaint given that Frazier testified that she was unaware Plaintiff had filed any EEOC complaints. (Defs.' Br. at 16 n.8 (citing Defs.' R. 56.1 Statement, Dkt. 107 ¶ 197).) That, however, is immaterial given that around the same time, Plaintiff submitted a race discrimination complaint to OEO, which specifically named Frazier. (OEO Compl., Dkt. 159-18 at ECF 2; OEO Rep., Dkt. 108-9 at 1.) Defendants do not contend that Frazier was unaware of that complaint, nor could they, given that OEO interviewed Frazier as part of its ensuing investigation. (Defs.' Br. at 16 n.8; OEO Rep., Dkt. 108-9 at 4.)

Next, Plaintiff must establish that she experienced at least one adverse employment action in the wake of her protected activity. "[A]n adverse action" is an action that is "likely to dissuade a reasonable worker in the plaintiff's position from exercising . . . legal rights." *Lawson v. Homenuk*, 710 F. App'x 460, 463 (2d Cir. 2017) (summary order) (quoting *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011)). This standard "covers a broader range of conduct than does the adverse-action standard for claims of discrimination." *Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 516–17 (E.D.N.Y. 2019) (quoting *Vega*, 801 F.3d at 90). Here, Defendants seemingly concede that there is at least a question of material fact as to whether Plaintiff's termination constituted an adverse action. (*Compare* Defs.' Br. at 18 (contending that the only

adverse action Plaintiff experienced was her termination),[23] *with* Pl.'s Br. at 23 (asserting that Plaintiff experienced a litany of adverse employment actions, ranging from Frazier's taking "away critical responsibilities from Plaintiff" to "den[ying] [Plaintiff] workplace equipment to ensure she failed at her job," among other things).)  Consequently, this element is met.

However, Defendants also contend that Plaintiff cannot establish a causal connection between the alleged adverse actions and her protected activities.  (Defs.' Br. at 18–19.)  "A causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  With respect to Plaintiff's claims of race-based retaliation, Defendants are correct that Plaintiff does not put forth evidence sufficient for a jury to find a causal connection between any of the alleged adverse actions and Plaintiff's complaints about race-related discrimination.  In fact, Plaintiff seemingly does not respond to this argument at all.  Instead, in the relevant section of her brief, she explains only how the Court could infer a causal connection between Plaintiff's requests for disability accommodations and the adverse actions she experienced.  (*See* Pl.'s Br. at 24–25 (arguing that Frazier retaliated against Plaintiff, after Plaintiff requested accommodations "for needing time off to attend medical appointments," and because of "Plaintiff's absences and emotional breakdown[] caused by Defendants' failure to accommodate Plaintiff's disabilities").) Plaintiff, then, has not raised a genuine issue of material fact as to whether there is a causal

---

[23] Although Defendants stress that Plaintiff experienced only one adverse action, i.e., termination, that fact, even if true, does not undermine her retaliation claim, since all that is required is one adverse action.

connection between Plaintiff's complaints of race discrimination and any of the alleged adverse actions. As such, the Court grants Defendants' summary judgment motion on Plaintiff's Title VII, § 1981, and NYSHRL claims for race, color, ethnicity, and national origin-based retaliation.

### B.    ADA, Rehabilitation Act, and NYSHRL Disability Discrimination Claims

Plaintiff brings claims for disability discrimination under several different statutes and theories. (*See generally* Am. Compl.) This section discusses Plaintiff's ADA, Rehabilitation Act and NYSHRL disability discrimination claims jointly because the same standards apply to employment discrimination claims brought under each of those laws. *Piligian v. Icahn Sch. of Med. at Mount Sinai*, 490 F. Supp. 3d 707, 716 (S.D.N.Y. 2020) (citing *Quadir v. N.Y. State Dep't of Labor*, No. 13-CV-3327 (JPO), 2016 WL 3633406, at *2 (S.D.N.Y. June 29, 2016)); *see also De Figueroa v. New York*, 403 F. Supp. 3d 133, 158 (E.D.N.Y. 2019) ("[W]hen claims are brought together under the ADA and Rehabilitation Act, the elements of the claims 'may be treated identically.'" (quoting *Hilton v. Wright*, 673 F.3d 120, 128 n.7 (2d Cir. 2012))). Each theory of liability that Plaintiff pleads is discussed in turn. For the reasons explained below, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's hostile work environment disability discrimination claims, but denies it with respect to Plaintiff's disability-based disparate treatment, failure to accommodate, and retaliation claims.

### 1.    Disparate Treatment

Disparate treatment claims brought under the ADA, the Rehabilitation Act, and the NYSHRL are analyzed through the *McDonnell Douglas* framework. *Castro v. City of New York*, 24 F. Supp. 3d 250, 260 (E.D.N.Y. 2014); *see also Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 796 (S.D.N.Y. 2020) (collecting cases). To establish a prima facie disability-based disparate treatment claim under these statutes, a plaintiff must demonstrate that "(1) [their] employer is subject to the ADA; (2) [they were] disabled within the meaning of the ADA; (3) [they were]

28

otherwise qualified to perform the essential functions of [their] job, with or without reasonable accommodation; and (4) [they] suffered adverse employment action because of [their] disability." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). "With respect to causation, a plaintiff must prove 'that 'but for' the disability, the adverse action would not have been taken.'" *Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023) (quoting *Natofsky v. City of New York*, 921 F.3d 337, 347 (2d Cir. 2019)).

As an initial matter, the parties dispute whether Plaintiff had a disability within the meaning of the ADA. (Pl.'s Br. at 7–11; Defs.' Br. at 7–9.) The ADA defines "disability" as a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "Major life activities" include, *inter alia*, "walking, standing, [and] lifting." *Id.* § 12102(2)(A). With these definitions in mind, the Court finds that Plaintiff has raised a genuine question of material fact as to whether she was disabled within the meaning of the ADA when she returned to P.S. 21 in September 2018. Around that time, Plaintiff provided multiple notes from her chiropractor explaining that she should "not do any heavy lifting, pushing[,] or pulling or any prolonged sitting, standing[,] or walking." (*See, e.g.*, 9/13/2018 Ltr. from Mollins, Dkt. 108-6.) Several of these limitations overlap with "major life activities" as defined in the ADA. *See* 42 U.S.C. § 12102(2)(A). Moreover, courts in this Circuit routinely hold that impaired ability to walk, sit, or stand constitutes a disability within the meaning of the ADA. *See, e.g.*, *Magnotti v. Crossroads Healthcare Mgmt., LLC*, 126 F. Supp. 3d 301, 312 (E.D.N.Y. 2015) (difficulty with walking constituted disability); *Picinich v. United Parcel Serv.*, 321 F. Supp. 2d 485, 502 (N.D.N.Y. 2004) (inability to sit, stand, or walk for over 30 minutes was substantially limiting impairment); *see also Parada v. Banco Indus. De Venez., C.A.*, 753 F.3d 62, 69–70 (2d Cir. 2014)

("[I]nability to sit for even an abbreviated period of time" can constitute "a substantial limitation of a major life activity[.]").

Defendants do not dispute that, apart from her disability-related limitations, Plaintiff was able to "perform the essential functions of [her] job." *Sista*, 445 F.3d at 169. Regarding the final element of the prima facie case for this claim—whether Plaintiff "suffered adverse employment action because of [her] disability"—Defendants argue that the only plausible adverse action was Plaintiff's termination. *Id.* In the context of disparate treatment claims, an adverse employment action "is 'a materially adverse change in the terms and conditions of employment.'" *Einsohn v. N.Y.C. Dep't of Educ.*, No. 10-CV-2660 (RPK) (RER), 2022 WL 955110, at *6 (E.D.N.Y. Mar. 30, 2022) (quoting *Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 434 (E.D.N.Y. 2015)). "An adverse employment action 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities and might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71–72 (2d Cir. 2019) (alteration in original) (quoting *Patrolmen's Benevolent Ass'n of City of N.Y. v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002)).

Here, Plaintiff argues that, shortly after she returned from her disability-related leave, Defendants subjected her to a litany of adverse actions as a result of disability-based animus: Plaintiff says that because Defendants withheld computer, printer, telephone, and wifi access, she was unable to do her job, (Pl. Decl. ¶¶ 40–42); she attests that she was "effectively demoted" when some of her responsibilities were given to Felix upon Plaintiff's return from leave, (*id.* ¶¶ 34–39); she provides evidence that Frazier inexplicably denied her request for bereavement leave, (*id.*

¶¶ 48–49); and other acts as well.  Ultimately, Plaintiff was terminated.  (3/26/2019 Ltr. from Frazier re: Termination, Dkt. 108-34.)  A reasonable jury could conclude that these actions, either individually or in combination, constituted "a materially adverse change in the terms and conditions of employment."  *Einsohn*, 2022 WL 955110, at *6 (quoting *Vale*, 80 F. Supp. 3d at 434).  As a result, there is, at a minimum, a genuine question of material fact as to whether these actions constitute adverse employment actions.

Further, through her testimony, Plaintiff raises a genuine issue of material fact as to whether these actions were "because of" her disability.  Most notably, Plaintiff testified that around the time she returned to work, Frazier told her not once, but twice, that she (Frazier) was going to "get rid of [Plaintiff]" and her "broken-down self."  (Pl. Dep. at 117:10–12, 127:23–128:1; *see also* OEO Compl., Dkt. 159-18 at ECF 2 (reporting to OEO, *inter alia*, that Frazier angrily referred to Plaintiff's "broken down self").)  A reasonable jury could conclude that Frazier made these comments and that they demonstrated discriminatory animus.  As a result, Plaintiff has raised a genuine question of material fact as to whether she experienced adverse employment actions up to and including termination as a result of disability-based discriminatory animus.  Plaintiff has thus established a prima facie case of disability-based disparate treatment.

Under the *McDonnell Douglas* framework, once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *See Vega*, 801 F.3d at 83; *McDonnell Douglas*, 411 U.S. at 802. Defendant does not address each alleged adverse action, but instead argues that Plaintiff "was terminated for legitimate, non-discriminatory reasons."  (Defs.' Br. at 10.)  Even assuming *arguendo* that a jury might agree, Defendants do not provide any alternative explanations for the *other* adverse employment actions Plaintiff asserts, apart from termination—e.g., the lack of a

functioning office, the unexplained denial of her bereavement leave, and her alleged demotion. (*See generally id.* at 10–11.)  Furthermore, even as to Plaintiff's termination, a reasonable jury could find that the reasons for the termination were illegitimate or discriminatory, or that even the seemingly legitimate reasons, such as Plaintiff's absences, were the by-product of the alleged disability-motivated adverse actions that preceded the termination.  Consequently, Defendants' motion for summary judgment as to Plaintiff's claims for disability-based disparate treatment claims under the ADA, the Rehabilitation Act, and the NYSHRL is denied.

## 2.   Failure to Accommodate

The ADA, the Rehabilitation Act, and the NYSHRL "require an employer to provide a reasonable accommodation for an employee's disability unless the accommodation would impose an undue hardship on the employer." *Tafolla*, 80 F.4th at 118 (ADA and NYSHRL); *see Conway v. Healthfirst Inc.*, No. 21-CV-6512 (RA), 2022 WL 4813498, at *5 (S.D.N.Y. Sept. 30, 2022) (Rehabilitation Act).  These claims are also evaluated using the *McDonnell Douglas* burden-shifting framework.  *Tafolla*, 80 F.4th at 118; *see Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 76 (2d Cir. 2016).  To set out a prima facie case for a failure-to-accommodate claim, a plaintiff must at least raise a genuine question of material fact that she (1) "is a person with a disability under the meaning of the [statute]; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, [the] plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Tafolla*, 80 F.4th at 118 (quoting *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009)).

As explained above, Plaintiff has raised a genuine question of material fact as to whether she has a disability within the meaning of the ADA.  *See supra* Section IV.B.1.  The parties do not dispute that Plaintiff can meet the second and third elements of the prima facie case—i.e., that Defendants are covered by the statutes at issue and that Plaintiff could perform the essential

functions of the job at issue.  The parties, however, do dispute whether Defendants refused to engage in the interactive process and whether Plaintiff was denied reasonable accommodations. (*Compare* Defs.' Reply at 8–10, *with* Pl.'s Br. at 11–15.)  The "interactive process" is a process "by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated."  *McBride*, 583 F.3d at 99 (quoting *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)) (internal quotation marks omitted).  That said, the ADA "does not speak directly to the process employers [are required to] undertake" in accommodating disabled employees.  *Id.* at 100 (quoting *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 194 (3d Cir. 2009)).  An "employer's failure to engage in such an interactive process . . . does not relieve a plaintiff of her burden of demonstrating, following discovery, that some accommodation of her disability was possible."  *Id.* at 101.

In this case, the only accommodation that Plaintiff requested was to attend three therapy appointments per week upon her return to work.  (Pl. Decl. ¶ 30.)  Courts conduct a two-step analysis to determine "whether the failure to provide a proposed accommodation constitutes a violation of the ADA."  *Jackan*, 205 F.3d at 566.  First, the plaintiff must prove that an accommodation would "permit[] her to perform the job's essential functions."  *Id.* (quoting *Borokowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).  Second, "[i]f the plaintiff meets that burden, the analysis shifts to the question [of] whether the proposed accommodation is reasonable; on this question the burden of persuasion lies with the defendant."  *Id.*  In this case, Plaintiff sought time off three days per week.  (Pl. Decl. ¶ 30.)  As she implies, Felix could have covered for her while she was out of the office.  (*See id.* ¶ 29.)

Since Plaintiff has established the existence of a reasonable accommodation, the burden "'shifts to the defendant to rebut the reasonableness of the proposed accommodation,' which 'is in

essence equivalent to the burden of showing, as an affirmative defense, that the proposed accommodation would cause the defendant to suffer an undue hardship.'" *Berger v. N.Y.C. Police Dep't*, 304 F. Supp. 3d 360, 369 (S.D.N.Y. 2018) (quoting *Wright*, 831 F.3d at 76).   "The reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder." *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015). Defendants contend that the issue with Plaintiff's requested accommodation was not the fact of the appointments, but that she did not provide documentation of the times of her appointments. (*See* Defs.' Reply at 9–10.)  This alone is not enough to establish as a matter of law that Plaintiff's requested accommodation was unreasonable; instead, this is a question for the jury.  As such, the Court denies summary judgment as to Plaintiff's failure to accommodate claims under the ADA, the Rehabilitation Act, and the NYSHRL.

### 3.   Hostile Work Environment

"To prevail on a hostile work environment claim," a plaintiff must demonstrate "that the harassment was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment[.]'" *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)).  "For the complained of conduct to be sufficiently pervasive, it 'must be more than episodic; [it] must be sufficiently continuous and concerted.'" *Kugel v. Queens Nassau Nursing Home Inc.*, 568 F. Supp. 3d 253, 263 (E.D.N.Y. 2021) (quoting *Alfano*, 294 F.3d at 374) (internal quotation marks omitted).

The only evidence Plaintiff points to support her disability-based hostile work environment claims is Frazier's two threats to "get rid of her" and her refusal to provide Plaintiff with her requested accommodation.  (Pl.'s Br. at 30.)  Starting with Frazier's comments, those alone are insufficient to state a claim for hostile work environment.  "For conduct to be adequately hostile and thus actionable . . . , a plaintiff's workplace must be 'permeated with discriminatory

intimidation, ridicule, and insult.'" *Kugel*, 568 F. Supp. 3d at 263 (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000)). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano*, 294 F.3d at 374 (quoting *Perry v. Ethan Allen, Inc.*, 294 F.3d 143, 149 (2d Cir. 1997)). Two discriminatory comments alone do not rise to this level. Similarly, even "obstinate and insensitive" responses to a plaintiff's "repeated requests for accommodation" do not, on their own, rise to the level of a hostile work environment. *Kugel*, 568 F. Supp. 3d at 263. Consequently, the Court grants Defendants' motion for summary judgment on this claim.

### 4. Retaliation

Courts also apply the *McDonnell Douglas* burden-shifting framework to retaliation claims under the ADA, the Rehabilitation Act, and the NYSHRL. *Tafolla*, 80 F.4th at 125 (ADA and NYSHRL); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (Rehabilitation Act). As explained above, to state a retaliation claim through the *McDonnell Douglas* framework, a plaintiff must first establish the prima facie case of retaliation. *Andalex*, 737 F.3d at 844. That requires a plaintiff to show "1) 'participation in a protected activity'; 2) the defendant's knowledge of the protected activity; 3) 'an adverse employment action'; and 4) 'a causal connection between the protected activity and the adverse employment action.'" *Id.* at 844 (quoting *Jute*, 420 F.3d at 173). The "but for" causation standard applies. *Tafolla*, 80 F.4th at 125 (quoting *Natofsky*, 921 F.3d at 347).

Plaintiff raises a question of material fact as to each of the elements of the prima facie case of disability-based retaliation. Regarding the first element—Plaintiff's participation in a protected activity—Plaintiff has adduced sufficient evidence to meet this element. She filed multiple formal complaints about disability-based discrimination. (*See* OEO Compl., Dkt. 159-18 at ECF 2; EEOC Pre-Charge Form, Dkt. 159-19 at ECF 2.) Because two complaints were made to DOE's OEO,

35

Defendants were certainly on notice of the protected activity.  (*See* OEO Rep., Dkt. 108-9 at 1.)  Similarly, OEO interviewed Frazier as a part of the resulting investigation, so she necessarily had notice of Plaintiff's underlying complaint to OEO.  (OEO Rep., Dkt. 108-9 at 4.)

In addition, "requests for accommodation constitute protected activity[.]"  *Lawton v. Success Acad. Charter Schs., Inc.*, 323 F. Supp. 3d 353, 366 (E.D.N.Y. 2018).  Plaintiff requested an accommodation upon her return to work in September 2018 so that she could attend her therapy appointments.  (Pl. Decl. ¶ 30.)  Shortly thereafter, she experienced a number of alleged adverse actions, including a demotion, an inexplicably denied bereavement leave request, and a non-functional office.  (*See* Pl. Dep. at 124:25–125:8 (demotion); *id.* at 100:18–101:8 (denied bereavement leave request); Pl. Decl. ¶¶ 40–42 (issues with office equipment).)  From these facts, a jury could conclude that Plaintiff experienced retaliation because of her disability-related protected activities, including her request for an accommodation and her formal complaints.  *See Tafolla*, 80 F.4th at 126 (explaining that a "close temporal relationship" between a request for accommodation and an adverse action "is sufficient to support an inference of retaliation.").

"Once the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action."  *Andalex*, 737 F.3d at 845 (citing *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011)).  As explained above, Defendants have not provided alternative explanations for the adverse employment actions Plaintiff asserts apart from termination.  *See supra* Section IV.B.1.  Consequently, a jury could find that Defendants retaliated against Plaintiff in violation of the ADA, the Rehabilitation Act, and the NYSHRL.  For that reason, Defendants' motion for summary judgment on Plaintiff's disability-based retaliation claims is denied.

36

### C.      Age Discrimination Claims

Plaintiff brings claims for age discrimination under both the ADEA and the NYSHRL. (*See generally* Am. Compl.)  The same standards apply to age-related employment discrimination claims brought under both laws.  *See Ramos v. W. Palm Corp.*, No. 23-CV-9441 (JMF), 2024 WL 3228449, at *2 (S.D.N.Y. June 27, 2024) ("[A]ge discrimination claims under the NYSHRL have long been considered to be identical to those under the ADEA[.]" (quoting *Marcus v. Leviton Mfg. Co., Inc.*, 661 F. App'x 29, 33 (2d Cir. 2016)).  The Court addresses each of Plaintiff's remaining age-based claims under these laws: disparate treatment and hostile work environment.

#### 1.      Disparate Treatment

As with Plaintiff's other disparate treatment claims, the *McDonnell Douglas* framework applies to Plaintiff's age-based disparate treatment claims.  *See Lively v. WAFRA Invest. Advisory Grp., Inc.*, 6 F.4th 293, 302 n.3 (2d Cir. 2021).  To establish a prima facie case of disability discrimination, a plaintiff must provide evidence from which a jury could conclude "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that the action occurred under circumstances giving rise to an inference of discrimination."  *Lively*, 6 F.4th at 302 n.3 (quoting *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012)).  The "but for" causation standard applies.  *Natofsky*, 921 F.3d at 347–48.

The parties do not dispute that Plaintiff can meet the first two elements of the prima facie case.  And, as discussed above, a jury could find that Plaintiff experienced several adverse actions, up to and including termination.  *See, supra*, Section IV.B.1.  A jury could also find that the final element of the prima facie case, "but for" causation, is met here.  Plaintiff testified that, the day before Plaintiff came back to work, Frazier told her that she was "looking for somebody a little more young and vibrant to be able to move at a faster pace" with the younger children at the school.

(Pl. Dep. at 96:15–18.)  Plaintiff also testified that the following day, her first day back at work, Frazier reiterated this sentiment.  (*Id.* at 98:8–10.)  And while Plaintiff was unsure of Felix's age, Plaintiff believed Felix to be "younger than [her]."  (*Id.* at 124:19–21.)  Around this same time, the series of adverse actions began.

Plaintiff's belief that Felix was "younger than her" is not, on its own, enough to demonstrate a causal connection between age discrimination and the adverse actions she experienced.  *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312–13 (1996) (holding that replacement by someone "substantially younger" than Plaintiff is sufficient to state a prima facie case, but that replacement by someone "insignificantly younger" is not).  But, in combination with Frazier's two comments about seeking someone "younger" around the same time that Plaintiff began experiencing adverse actions, there is enough evidence to raise a genuine question of material fact as to whether the adverse actions she claims occurred resulted from age discrimination.  *See Hird-Moorhouse v. Belgian Mission to the United Nations*, No. 03-CV-9688 (RWS), 2010 WL 3910742, at *4 (S.D.N.Y. Oct. 5, 2010) (holding that Plaintiff established a genuine question of material fact as to age discrimination where she was told that employer "needed a 'younger image' and that she was 'too old for her job'"); *Monteiro v. United Techs. Corp. Pratt & Whitney Div.*, 119 F. Supp. 2d 71, 76 (D. Conn. 2000) (same, where a "decisionmaker made a comment implying a preference for younger employees").

As with the other claims for which Plaintiff can establish a prima facie case, Defendants do not address each alleged adverse action, but instead merely argue that Plaintiff "was terminated for legitimate, non-discriminatory reasons." (Defs.' Br. at 10.)  Because Defendants do not provide any alternative explanations for the other adverse employment actions that Plaintiff alleges, her age-based disparate treatment claims survive summary judgment.  Defendants' motion for

summary judgment as to Plaintiff's claims for age-based disparate treatment under the ADEA and the NYSHRL is denied.

### 2.   Hostile Work Environment

The same standard that applies to Plaintiff's age-based hostile work environment claim applies to her disability-based hostile work environment claim.   *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 240–41 (2d Cir. 2007) (explaining that to state a hostile work environment claim under the ADEA, a workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment" (quoting *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)). Because the only evidence Plaintiff identifies in support of her age-based hostile work environment claim are Frazier's two comments about wanting to hire somebody "younger," Plaintiff is unable to establish the requisite severity or pervasiveness to prevail on this theory.   *See Alfano*, 294 F.3d at 374.   The Court therefore grants summary judgment on this claim.

### CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment is granted in part and denied in part.   The claims that survive summary judgment and will proceed are:

(1)    Plaintiff's claims for disability-based disparate treatment, failure to accommodate, and retaliation under the ADA (against DOE), the Rehabilitation Act (against DOE), and the NYSHRL (against Frazier), *see* Section IV.B.; and

(2)    Plaintiff's age-based disparate treatment claims under the ADEA (against DOE) and the NYSHRL (against Frazier), *see* Section IV.C.

Summary judgment is granted with respect to all other claims, which are dismissed with prejudice.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: August 26, 2024
       Brooklyn, New York